**MEDICAL WEST BUILDING CORPORATION, Plaintiff-Appellant,**

v.

**E. L. ZOERNIG & COMPANY, Defendant-Respondent.**

No. 51952.

Supreme Court of Missouri, Division No. 1.

April 10, 1967.

Motion for Rehearing or for Transfer to Court En Banc Denied May 8, 1967.

Opinion Modified and Cause Remanded May 8, 1967.

Guilfoil, Caruthers, Symington, Montrey & Petzall, Rexford H. Caruthers, Gerald M. Smith, Darold E. Crotzer, Jr., St. Louis, for appellant.

William C. Maier, Charles R. Judge, Dubail, Judge & Kilker, Arnot L. Sheppard, Gentry, Bryant & Sheppard, St. Louis, for respondent.

WELBORN, Commissioner.

This is an action by Medical West Building Corporation, owner, for damages for

breach of lease by E. L. Zoernig & Company, tenant. A jury returned a verdict in favor of the plaintiff for $17,220 damages, plus $3,616.20 interest. Upon motion of the defendant, the trial court set aside the verdict and entered judgment for defendant. Plaintiff has appealed.

Medical West Building Corporation was the owner of an office building located in St. Louis County. E. L. Zoernig & Company leased a suite of offices in the Medical West Building for a term of five years, from March 1, 1957 to February 28, 1962, at a rental of $400 per month. The Security Loan & Discount Corporation, in which the Zoernig Company had a financial interest and of which Richard J. Zoernig was the executive officer, had a ten-year contract with the owner to manage the building.

In February, 1958, O. S. Rudman and Ann Rudman acquired from Zoernig the majority stock of the Medical West Corporation. As a part of the transaction, the Rudmans agreed to cause Medical West to employ Richard J. Zoernig as building manager. The agreement referred to the Zoernig Company lease and then provided:

"If at any time during the term of the present lease or the renewal thereof as aforesaid, the employment of Richard J. Zoernig as Building Manager is terminated by the corporation, then the lessee shall have the right to cancel the remaining term of said lease without penalty provided notice of such cancellation is given within ninety (90) days following the effective date of termination of such employment."

Medical West and Richard Zoernig entered into a management agreement for a one-year term, beginning February 15, 1958, with right of renewal.

In March, 1958, the new owners decided to alter the policy regarding parking facilities provided for tenants and their patients or customers. This action eventually produced the litigation reported in Bryan v. Medical West Building Corporation, Mo.

App., 345 S.W.2d 389. Richard Zoernig disagreed with the new policy and declined to circulate the notice of it to the tenants.

On March 25, 1958, a meeting, called by Rudman, was held. In attendance were about fifteen tenants, who were also stockholders of Medical West, Mr. Rudman, and Selig Oxenhandler, a real estate broker who had participated in the negotiations leading to Rudman's stock purchase. Oxenhandler, although not a stockholder, had been elected vice-president of Medical West. An attorney for Medical West and an attorney for some of the tenants were also present.

According to Rudman, the tenants voiced numerous protests about Zoernig's management of the premises, including inadequate cleaning, lack of attention to complaints and varying rental charges. According to Rudman, the parking issue was discussed merely by way of explanation to the stockholders of the corporation's financial problems. Oxenhandler stated that various complaints of the tenants were aired, but that parking was discussed only insofar as the tenants were complaining that employees of tenants were occupying an excessive amount of parking space.

Testifying as a witness for the defendant, the attorney representing the stockholders stated that the parking issue was the only matter discussed at the meeting. According to him, Rudman explained the corporation's financial position and the necessity of charging for parking. A spokesman for the tenants replied that they were entitled to free parking under their leases and intended to insist upon it, regardless of the "supposed bad condition of the finances of the corporation." The witness stated that nothing was settled at the meeting.

The next day, Rudman and Oxenhandler met with Zoernig and told him of the complaints against him which had been voiced at the meeting. According to Rudman, Zoernig was upset, resentful of the tenants' lack of appreciation for his ef-

forts and said that he did not wish to have anything more to do with them. Rudman quoted Zoernig as saying "[You can] have the management." Oxenhandler testified that Zoernig was disgusted with the tenants' attitude and "didn't care whether or not he continued to take care of the thing or do or have anything to do with most of them because * * * he felt that those that complained the most were those he did the most for." Oxenhandler also stated that before the meeting concluded, Zoernig instructed his secretary to turn the keys over to Oxenhandler that afternoon.

Zoernig's version of the meeting was somewhat different. According to him, Oxenhandler had previously begun to take a hand in the management of the building and Zoernig had done nothing after Oxenhandler began to take over the management duties. Zoernig testified that, when Rudman and Oxenhandler came to his office, "the very first statement that was made when they came into my office was they were surprised that I was still around, they thought I would either have been shot or chased out. The next statement was made pertaining to parking, putting in parking charges when I had represented free parking to all the tenants. I was very much disturbed at that time. The next remark was made by Mr. Rudman that he thought that perhaps my usefulness as manager had disappeared. * * * Then I just reiterated what I had been saying ever since the building had been sold, that a mistake was being made by putting in parking charges when I had represented it to the tenants it would all be free parking included in their rent and I didn't know why I should be blamed for something that the new owners wanted to do." Zoernig denied that he stated he wanted to quit as manager.

Rudman stated that immediately after the meeting with Zoernig he asked Oxenhandler to take over the management of the building. Oxenhandler got the keys from Zoernig's secretary that afternoon and later sent out the April 1 rent notices. Subsequently, the management files were turned over to Oxenhandler by Zoernig's secretary.

On March 27, 1958, Oxenhandler presented to Zoernig for his signature a typewritten letter addressed to Medical West, stating: "I, Richard J. Zoernig, wish to be relieved of my responsibility as building manager of the Medical West Building effective as of March 31, 1958." Zoernig refused to sign the document.

On March 29, Oxenhandler asked Charles Judge, an attorney for the Zoernig Company and one of the original stockholders of Medical West: "Why doesn't Richard Zoernig give up the management of the building?" Judge replied: "If you give him a little time, have a little patience, he may come to that conclusion and be willing to step down on the basis of E. L. Zoernig moving out of the building." Oxenhandler, according to Judge, replied: "I believe something like that can be worked out."

On April 11, 1958, Oxenhandler, as vice-president of Medical West, advised Richard L. Zoernig of the receipt of the records and keys. In the letter he stated: "This action on your part is construed by this company to be your voluntary relinquishing of your duties of building manager and therefore terminates your Management Contract as of April 1, 1958."

On April 15, 1958, on behalf of Richard Zoernig, Judge addressed a letter to Oxenhandler in which he stated:

"Your letter to Richard Zoernig of April 11, 1958 has been turned over to me for attention. Your assumption that his act of delivering to you records, keys and other items constituted a relinquishment of his duties as Building Manager is wholly unwarranted. He did these things solely because you as Vice President and Director of the Corporation requested him to do so. It is our position that his Management Contract is still in full force and effect and he stands willing to continue to perform his duties thereunder.

"If it is the desire of the Corporation to negotiate a termination of this Management Contract I will be glad to discuss this matter with you."

On April 24, 1958, Gideon Schiller, of the law firm of Ackerman, Schiller & Lake, and acting on behalf of Medical West, wrote Judge as follows:

"This will acknowledge your letter of April 15, 1958 to S. Z. Oxenhandler concerning the Richard Zoernig matter. I have discussed this matter with Oxenhandler and I can only conclude from the facts at hand that Zoernig relinquished his duties as Building Manager of his own accord although in fact there were ample grounds for discharging him.

"Should you care to discuss the matter with me please give me a call at your convenience."

On June 4, 1958, Judge, as attorney for Zoernig & Company, addressed a letter to Mr. Rudman as President of Medical West Building Corporation. In this letter he stated:

"Under the terms of the agreement entered into on February 3, 1958 by and between Richard J. Zoernig, Emil L. Zoernig and Charles R. Judge, first parties and O. S. Rudman and Ann Rudman, second parties, pertaining to the sale of controlling stock of Medical West Building Corporation, it was provided that if the employment of Richard J. Zoernig as building manager of Medical West Building were terminated, the lessee of Suite 203 shall have the right to cancel the remaining term of its lease without penalty upon notice given within ninety (90) days following the effective date of termination.

"Since Medical West Building Corporation has taken the position that the employment of Richard J. Zoernig as building manager is terminated, please be notified that E. L. Zoernig & Co., Inc., lessee of Suite 203 of Medical West Building under lease dated February 1, 1957, does

hereby exercise its right to cancel the remaining term of said lease without penalty. You will be advised shortly as to the date of removal."

On July 30, 1958, Zoernig & Company entered into a lease for other premises. On July 31, 1958, Judge, on behalf of Zoernig & Company, wrote Rudman: "With reference to our letter to you of June 4, 1958 exercising our right to cancel the remaining term of our lease of Suite 203 of Medical West Building, please be advised that we will vacate said suite on or before September 1, 1958."

Following the transmittal of this letter, Judge had a telephone conversation with Gideon Schiller, Medical West's attorney. Schiller asked if Zoernig & Company really wanted to move. Judge replied: "Yes, is there any objection to this?" Schiller stated: "I don't know, but I'm going to be with Mr. Rudman over the week end and if there is I will let you know promptly."

On August 6, Judge received a letter dated August 5 from Ackerman, Schiller & Lake, signed by Paxton H. Ackerman, which stated, in reference to Judge's July 31st letter:

"Medical West Building Corporation has no control over the desires of your client to vacate their suite; however, our client shall expect them to live up to their obligations, particularly for payment of rent under the terms of their lease, inasmuch as it is the position of our client that E. L. Zoernig & Co., Inc., as Lessee, has no legal basis for cancellation of their lease.

"That silence on the part of our client not be construed as an admission or acquiescence in the respects of your instant and prior correspondence in this matter, we are merely writing this letter on behalf of Medical West Building Corporation to advise that our client is not in agreement with the position expressed by you in your correspondence to them."

Zoernig & Company did vacate the Medical West suite. Medical West was unable to lease the quarters during the remainder of the term of the Zoernig lease and thereafter brought this suit for the rental due during the balance of the term amounting to $17,220 with interest in the amount of $3,616.20.

Defendant's answer stated its position that Zoernig's employment had been terminated by the plaintiff and that defendant exercised the right of cancellation given it in such event. The answer also alleged that, on July 31, notice of vacation of the premises had been given to the plaintiff, that, from June 4, 1958 until after July 30, 1958, plaintiff had failed to advise the defendant of its opposition to cancellation of the lease and plaintiff was therefore estopped to deny that the lease was validly cancelled.

The issue of Richard Zoernig's services as building manager was submitted to a jury. Plaintiff's instruction called for a verdict in its favor if the jury believed that Zoernig voluntarily terminated his position. Defendant's instruction called for a verdict in its behalf if the jury believed that plaintiff terminated Zoernig's employment. On these instructions the jury returned a verdict in favor of the plaintiff.

Thereafter the court considered the issue of estoppel as a separate equitable issue and concluded that because of the failure of the plaintiff to respond to the June 4, 1958 notice of cancellation plaintiff was estopped to deny the validity of the act of cancellation. The trial court also set aside the jury's verdict on the grounds that there was no submissible issue on the question of the voluntariness of Zoernig's leaving his position, the court concluding that the leaving was obviously by consent and actively participated in by Mr. Rudman and Mr. Oxenhandler and was not a voluntary quitting. This appeal followed.

Appellant concedes that, if the trial court properly upheld the defense of estoppel, the setting aside of the jury's verdict becomes of no moment. We therefore consider the estoppel question first.

■ Estoppel is a factual matter to be determined on the facts of the particular case. Finance Service Corp. v. Kelly, Mo. App., 235 S.W. 146, 147; Cannon v. Travelers Indemnity Company, 8th Cir., 314 F.2d 657. The numerous cases cited by the parties on this appeal involved factual circumstances different from those here. They are primarily helpful in setting out the general principles of estoppel, which we must apply here.

"The most comprehensive definition of equitable estoppel or estoppel in pais is that it is the pirnciple by which a party who knows or should know the truth is absolutely precluded, both at law and in equity, from denying, or asserting the contrary of, any material fact which, by his words or conduct, affirmative or negative, intentionally or through culpable negligence, he has induced another, who was excusably ignorant of the true facts and who had a right to rely upon such words or conduct, to believe and act upon them thereby, as a consequence reasonably to be anticipated, changing his position in such a way that he would suffer injury if such denial or contrary assertion was allowed. In the final analysis, however, an equitable estoppel rests upon the facts and circumstances of the particular case in which it is urged, considered in the framework of the elements, requisites, and grounds of equitable estoppel, and consequently, any attempted definition usually amounts to no more than a declaration of an estoppel under those facts and circumstances." 28 Am.Jur.2d, Estoppel and Waiver, § 27, pp. 627–628. See State ex inf. Shartel ex rel. City of Sikeston v. Missouri Utilities Co., 331 Mo. 337, 53 S.W.2d 394, 89 A.L.R. 607.

■ In this case, the conduct relied upon to establish the defense was the failure of plaintiff to respond to the June 4th notice of cancellation until after de-

fendant had obligated itself under a new lease of premises to replace those leased from plaintiff. That silence may give rise to an estoppel is well recognized. State ex inf. McKittrick ex rel. City of California v. Missouri Utilities Co., 339 Mo. 385, 96 S.W.2d 607, 615 [9], 106 A.L.R. 1169. However, silence may properly be relied upon only when the party to be estopped is under a duty to speak up and not remain silent. "For a 'standing by' to become the predicate of equitable estoppel, it is necessary that the person remaining silent be under a duty to speak. In other words, he must speak only when common honesty and fair dealing demand that he do so." State ex inf. McKittrick ex rel. City of California v. Missouri Utilities Co., supra, 96 S.W.2d 615 [10].

As the defendant was obviously aware, the situation which gave it the right to cancel its lease was the plaintiff's termination of Richard Zoernig's services as building manager. Although defendant points out that the correspondence from plaintiff's officer and attorney, expounding plaintiff's position that Zoernig had voluntarily quit the management job and had not been discharged, was addressed to Richard Zoernig and Charles Judge and not to the defendant-lessee, defendant made no effort to show lack of actual knowledge of the conflicting positions of the parties to the management contract. In view of Richard Zoernig's position as an executive officer of defendant, its knowledge of plaintiff's previously expressed position could hardly have been denied by defendant. Without question, Mr. Judge, who wrote the cancellation notice, was aware of the plaintiff's position. The April 24th letter was addressed to Judge. In fact, he testified that, at the time of preparation of the cancellation notice, he was aware of plaintiff's position with respect to the management contract.

■ We cannot agree that in these circumstances the June 4th letter placed Medical West under any obligation to re-iterate its previously stated position. Medical West was in possession of no knowledge not known to the lessee. Both parties were aware of what had occurred and both had previously expressed their divergent views upon the conclusion to be deduced from the occurrences. The lessee chose to act upon its conclusion that Medical West had terminated the services of Zoernig. That conclusion was in no manner encouraged by Medical West, which had, in fact, taken the known position that Zoernig had voluntarily surrendered his position. Having chosen to act upon the conclusion favorable to its position, the lessee could not impose any duty upon the lessor by an announcement of intention to act upon its conclusion.

Furthermore, there is no evidence in this case of action by the lessee in reliance upon Medical West's failure to reply to the June 4th letter. The defendant did ultimately give notice of vacation of the premises and did, on July 30, enter into a lease for space elsewhere. However, insofar as the record here shows, that action was taken in reliance upon the defendant's position that it had the right to terminate the lease, a position which it had taken without any encouragement from plaintiff.

■ The defendant here, in its brief, acknowledges an absence of direct evidence of reliance by it upon plaintiff's failure to respond to the June 4th communication. According to defendant, the absence of such testimony is "due (1) to the exclusion of testimony by Richard Zoernig over plaintiff's objection that only E. L. Zoernig, as managing officer of defendant who negotiated its new lease, was competent to testify * * * and (2) to the feeble condition of E. L. Zoernig which prevented him from testifying." The record shows that Richard Zoernig testified that his father, E. L. Zoernig, negotiated the new lease. Richard Zoernig testified that, as a stockholder and officer of defendant, he knew why the lease for the new space was not executed until July 30. However, when

plaintiff's counsel objected to the witness's stating the reason for the delay, defendant's counsel withdrew his question and nothing appears, by way of offer of proof or otherwise, as to what the witness might have testified. Richard Zoernig did testify that his father was very feeble and that he would not approve of his father's appearance as a witness. However, that fact would not dispense with the necessity of proof of an essential element of the defense relied upon. The burden was upon the defendant to prove the essential elements of the defense of estoppel. Emery v. Brown Shoe Company, Mo.Sup., 287 S.W.2d 761, 767 [4]; Midwestern Machinery Company v. Parsons, Mo.App., 385 S.W.2d 224, 228 [6–10].

In our opinion, the mere fact of delay in entering into the new lease does not establish the element of reliance. The delay might have been occasioned by many factors, wholly unrelated to the silence of plaintiff. Absent some evidence on the subject, we cannot conclude that the mere fact of delay established that the action ultimately taken was in reliance upon plaintiff's silence. Hogue v. Wurdack, Mo.App., 298 S.W.2d 492, 498 [12–14].

In our opinion, the defendant's evidence did not establish its defense of estoppel. Therefore, we must determine whether or not the trial court properly set aside the jury's verdict, necessarily based upon the jury's finding that Richard Zoernig voluntarily terminated his management contract. In reviewing the matter, the evidence must be viewed in the light most favorable to the verdict. Rhyne v. Thompson, Mo.Sup., 284 S.W.2d 553, 556 [1]; Mo.Digest, Appeal and Error, ⬚934 [1], 989. So viewed, there can be no doubt that there was evidence to support the jury's verdict. The testimony of Rudman and Oxenhandler would justify the finding which the jury made. That the evidence might have supported a contrary verdict or that it might have supported a verdict favorable to defendant on a theory not submitted would not justify setting aside the verdict.

The unsubmitted theory was that Zoernig's quitting was not voluntary but was the result of plaintiff's action. See Bussmann Mfg. Co. v. Industrial Commission, Mo.App., 335 S.W.2d 456, 460 [6–11]. Defendant offered an instruction on this theory, but it was rejected by the trial court. However, the trial court granted no relief on the basis of its refusal of the instruction and the only question before us is whether or not the evidence supported the verdict on the theories submitted.

The judgment is reversed and the cause remanded with directions to the trial court to consider and act upon respondent's motion for a new trial.

HOUSER and HIGGINS, CC., concur.

PER CURIAM:

The foregoing opinion by WELBORN, C., is adopted as the opinion of the Court.

HOLMAN, P. J., and HENLEY, J., concur.

SEILER, J., concurs in result.

## ON MOTION FOR REHEARING OR IN THE ALTERNATIVE FOR A TRANSFER TO THE COURT EN BANC

PER CURIAM.

Respondent, by its motion for rehearing, urges that this court should not have directed the entry of judgment in favor of the appellant on the jury's verdict. Respondent points out that its motion for judgment which the trial court sustained was coupled with an alternative motion for a new trial. Despite the requirement of Civil Rule 72.02, V.A.M.R., the trial court made no ruling on the alternative motion for a new trial.

Respondent suggests that, although the trial court made no ruling on the motion for new trial, it clearly considered that the verdict was against the weight of the evidence and that we should order a new trial on such basis. We reject this suggestion. Having found in favor of the respondent on the estoppel issue, the trial court was obviously required to expunge the jury verdict in order to enter judgment favorable to respondent. We will not speculate on what the trial court might have done had he considered the motion for new trial, as he was required to do.

Respondent alternatively suggests that we should remand with directions to the trial court to consider the motion for new trial. This action was taken when a similar situation confronted this court in State ex rel. and to Use of Hickory County v. Davis, 302 S.W.2d 892, 897–898 [6–10].

The action in Davis was taken with some reluctance, the court noting its disapproval of the practice of treating piecemeal with alternative motions. Davis was decided under § 510.290, RSMo 1949, which did not contain the requirement of Civil Rule 72.02: "If the trial court sustains a motion for judgment in accordance with a directed verdict joined with a motion for new trial in the alternative, the trial court shall make and enter of record a ruling on the alternative motion for new trial to be effective if the ruling on the motion for judgment is reversed." This added provision was obviously intended to avoid the situation presented in Davis. See Federal Rule 50(c). Litigants who elect to take advantage of the privilege of combining a motion for judgment with an alternative motion for a new trial have an obligation to see that the trial court act, in accordance with Rule 72.02, at the risk of being held to have waived their motion for new trial. See Vera Cruz v. Chesapeake & Ohio Railroad, 7th Cir., 312 F.2d 330, 332 [5].

Appellant has offered no objection to the suggestion advanced by respondent's motion for rehearing. In the interest of justice, we will in this case modify our original direction and reverse the trial court's judgment and remand the cause with directions to the trial court to consider and act upon respondent's motion for a new trial.